# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **KIERSTEN DENNISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13CV707 ACL** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Kiersten Dennison for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. [Doc. 15] Defendant filed a Brief in Support of the Answer. [Doc. 20]

## Procedural History

On September 13, 2010, Plaintiff filed an application for Disability Insurance Benefits, claiming that she became unable to work due to her disabling condition on June 30, 2010. (Tr. 111-12.) This claim was denied initially and, following an administrative hearing, Plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated February 22, 2012. (Tr. 60-65, 8-20.) Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on February 28, 2013. (Tr. 7, 1-6.) Thus, the decision of the ALJ stands as the final decision of the

Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

A.      **ALJ Hearing**

Plaintiff's administrative hearing was held on December 12, 2011. (Tr. 27.) Plaintiff was present and was represented by counsel. Also present was vocational expert Brenda Young.

Plaintiff's attorney stated that Plaintiff has been diagnosed with major depression and generalized anxiety disorder, and experiences a lot of pain in the coccyx[1] area. (Tr. 30.) Plaintiff's attorney argued that Plaintiff is unable to work due to a combination of her emotional condition (major depression and general anxiety disorder) and her pain from coccydynia. <u>Id.</u>

Plaintiff testified that she was forty-three years of age; five-feet, five inches tall; and weighed 180 pounds. (Tr. 31.)

Plaintiff stated that she was married, and had five biological children, one stepson, and one grandson she was raising. <u>Id.</u> Plaintiff testified that her children were aged three to twenty-one, and four of the children lived with her at the time of the hearing. <u>Id.</u> Plaintiff stated that her husband worked as a manager of a business. (Tr. 32.)

Plaintiff testified that she had a driver's license, and that she drove to medical appointments and the grocery store. <u>Id.</u> Plaintiff stated that she drove approximately once a week, however, she tries to avoid driving due to lower back pain. <u>Id.</u> Plaintiff stated that her daughter drove her to the hearing. <u>Id.</u>

Plaintiff testified that she obtained her GED. (Tr. 33.) Plaintiff stated that she has not taken any college courses or received any vocational training. (Tr. 33.) She has not worked at

---

[1]  The coccyx, or tailbone, is the small bone at the end of the vertebral column. <u>Stedman's Medical Dictionary</u>, 403 (28th Ed. 2006).

2

all since June 30, 2010.   Id.

Plaintiff stated that she received a workers' compensation settlement in April of 2010.   Id.
Plaintiff testified that she fell at work and injured her knee.   (Tr. 34.)

Plaintiff stated that she had health insurance through her husband's employer.   (Tr. 35.)

Prior work included plaintiff's office administrative duties and warehouse work at A.C.
Systems.   Id.   At times, she lifted as much as seventy pounds as part of her job responsibilities.
(Tr. 35-36.)   She left that position, because she was unable to work due to her coccydynia.[2]   (Tr.
36.)   Plaintiff also performed office work at Jiffy Lube; she quit that position when she married
her husband.   (Tr. 36.)   From 2001 to 2002, plaintiff worked as a care-taker for her disabled aunt.
Plaintiff also worked as a bus driver for First Student; she loaded students in wheelchairs onto the
bus and performed inspections of the bus.   (Tr. 37)   Plaintiff quit the bus driver position when her
son was diagnosed with leukemia.   Id.

After injuring her knee in the work accident, plaintiff participated in physical therapy.
(Tr. 38.)   Use of an exercise bike was part of the therapy.   Id.   Plaintiff started experiencing pain
in her low spine, or coccyx area, after using the exercise bike.   Id.   Plaintiff indicated she has
learned to adjust her life around the pain she experiences.   (Tr. 39.)   Plaintiff stated that she
avoids stairs, sitting for long periods, and standing for long periods, due to her pain.   Id.

Plaintiff has seen pain specialists who recommended injections.   Id.   She did not undergo
the injections, because she has "an extreme phobia of medication" since she suffered an allergic
reaction to medication as a teenager.   Id.

Plaintiff initially took Percocet[3] for her tailbone pain, because her doctors convinced her it

---

[2] Pain in the coccygeal region.   See Stedman's at 403.
[3] Percocet is indicated for the relief of moderate to moderately severe pain.   Physician's Desk

was safe.  Id.  She started taking Vicodin[4] instead, because the Percocet upset her stomach.  (Tr. 40.)  She takes Vicodin three times a day—she says it "takes the edge off" her pain and allows her to "function a little better daily."  Id.

Plaintiff is able to take care of her three-year-old child, do housework, and shop for groceries when she takes pain medication.  Id.  Plaintiff needs someone with her to shop for groceries; they help carry things and are there due to her balance problems.  Id.

Plaintiff testified that she started taking Ativan[5] for anxiety after her son was diagnosed with leukemia.  (Tr. 41.)  She has had anxiety attacks all her life, but they increased when her son became ill.  Id.  Plaintiff's pain management physician referred her to Dr. Sherri Bassi due to her medication phobia and plaintiff sees Dr. Bassi approximately twice a month.  (Tr. 42)  Plaintiff started seeing Dr. Datta, a psychiatrist, five months prior to the hearing.  (Tr. 41)  Dr. Datta started plaintiff back on Ativan.  Id.  Plaintiff had been struggling to leave her house or do anything due to anxiety.  Id.

Plaintiff stated she does not feel comfortable leaving the house because of her depression and anxiety.  (Tr. 42.)  Plaintiff has crying spells "all the time," because she feels like a burden to her family.  Id.  She is unable to go to the movies, or sit at the kitchen table with her family at dinner, because she experiences back pain when sitting for long periods.  (Tr. 43.)  She stated that does not attend functions at her kids' school unless she can stand during the events.  Id.  Plaintiff fears she will experience an anxiety attack while visiting friends or relatives.  Id.

Plaintiff testified that an anxiety attack feels like a heart attack, specifically, she feels

---

Reference (PDR), 1127 (63rd Ed. 2009).
[4] Vicodin is indicated for the relief of moderate to moderately severe pain.  PDR at 529.
[5] Ativan is indicated for the treatment of anxiety.  See WebMD, http://www.webmd.com/drugs (last visited September 4, 2014).

scared, her heart beats fast, and she becomes hot and dizzy.   Id.   She experiences anxiety attacks

three to four times a week, and they last fifteen to twenty minutes.   Id.   Plaintiff is really tired

after experiencing an attack, and usually rests the remainder of the day.   (Tr. 44.)

Plaintiff testified that Dr. Bassi referred her to a psychiatrist, because her anxiety attacks

were becoming more severe.   Id.   The psychiatrist increased her Ativan and suggested that she

take Cymbalta,[6] because it would help with her anxiety, depression, and fibromyalgia.[7]   Id.

Plaintiff stated that she cannot take Cymbalta, because she is afraid she will have a bad reaction to

it.   Id.

Plaintiff indicated that she experiences occasional problems with concentration and

memory when her pain is severe.   Id.   Her sleep varies in that she has periods during which she

sleeps well, and then other periods when she only sleeps two to three hours a night.   (Tr. 45.)

Plaintiff stated that she has good days and bad days.   Id.   She has a daily goal to always

"at least fix dinner."   Id.   On a good day, plaintiff is able to do laundry and sweep the floors.   Id.

She has good days about half of the time.   Id.

The ALJ re-examined Plaintiff, who testified that she is able to sit about ten minutes before

she experiences severe pain.   (Tr. 46.)   She is able to stand for about ten minutes before she has to

sit down due to pain.   Id.   Plaintiff explained that she experiences lower back pain due to the

coccydynia and "aches all the time" due to fibromyalgia.   Id.

The ALJ next questioned the vocational expert (VE) , Ms. Young, who classified

Plaintiff's past work as follows:   secretarial and office work (light, semi-skilled); school bus

---

[6] Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety
disorder.   See PDR at 1801.

[7] A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue,
and sleep disturbances; the cause is unknown.   Stedman's at 725.

driver (medium, semi-skilled); and healthcare aide (heavy, unskilled).   (Tr. 47-48.)

The ALJ asked the VE to assume a hypothetical claimant with Plaintiff's background and the following limitations:   light work; unable to climb ladders, ropes, or scaffolds; unable to operate foot controls; occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; avoid all operational control of moving machinery, working at unprotected heights, use of any hazardous machinery; avoid concentrated exposure to extreme vibration; limited to simple, routine, repetitive tasks; and low stress job, with only occasional decision-making, occasional changes in the work setting, and occasional interaction with the public.   (Tr. 48.)   The VE testified that the individual would be unable to perform any of Plaintiff's past work.   The VE stated that the individual could perform other light, unskilled work, such as: cafeteria counter/salad bar attendant (400,000 positions nationally, 4,000 locally); or semi-skilled positions such as file clerk (186,000 positions nationally, 2,000 locally); and small product assembly (7000,000 positions nationally, 7,000 locally).   (Tr. 48-49.)   The VE testified that employers at the positions cited would tolerate no more than one unexcused absence per month.   (Tr. 49.)

The ALJ next asked the VE to assume the same limitations as the first hypothetical with the additional limitation of a sit/stand option once every hour.   Id.   The VE testified that only the file clerk position would remain.   (Tr. 50.)

The ALJ next asked the VE to assume an individual who was limited to sedentary work, with a sit/stand option once every hour while remaining on task, along with the other limitations set forth in the first hypothetical.   Id.   The VE testified that the individual could perform a portion of the small assembly jobs (300,000 positions nationally, 3,000 locally).   Id.

Finally, the ALJ asked the VE to assume the same limitations set forth in the last

hypothetical, but the individual requires a sit/stand option once every thirty minutes while remaining on task.   (Tr. 50-51.)   The VE testified that this limitation would eliminate all jobs. (Tr. 51.)

Plaintiff's attorney asked the VE to assume the following limitations:   unable to complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, or deal with normal work stress.   Id.   The VE testified that such an individual would be unable to engage in competitive employment.   Id.

**B.**     **Relevant Medical Records**

Plaintiff presented to the emergency department at SSM Depaul Health Center on April 26, 2010, with complaints of left knee pain after falling on a floor mat at work.   (Tr. 179.)   No swelling or crepitus was noted on examination.   Id.   Plaintiff was diagnosed with contusion of the left knee, and was prescribed crutches.   (Tr. 181.)

Plaintiff presented to the emergency department at SSM Depaul Health Center on July 13, 2010, with complaints of low back pain.   (Tr. 197-98.)   Plaintiff underwent x-rays, which revealed slight scoliosis, but no acute fracture, subluxation, or dislocation.   (Tr. 198.)

Plaintiff returned to the emergency department on July 23, 2010, at which time she complained of pelvic pain, rectal pain, urinary incontinence, coccydynia, and fatigue.   (Tr. 209.) She underwent an MRI of the pelvis, which revealed previous pelvic surgery, but no fracture, bone marrow edema, or lesion.   (Tr. 210.)   An MRI of the lumbar spine was unremarkable.   (Tr. 216.)

Plaintiff presented to Terry J. Weis, D.O., at Northland MidAmerica Orthopedics on July 27, 2010, with complaints of tailbone, hip, and low back pain.   (Tr. 223.)   Dr. Weis diagnosed

Plaintiff with coccydynia and prescribed Medrol Dosepak.[8]  (Tr. 225.)  On August 2, 2010,

Plaintiff reported "fairly good relief" from her symptoms with medication, and that she continued

to have "mild coccydynia." Id.  On August 16, 2010, Dr. Weis noted that Plaintiff had continued

coccydynia, with no neurologic or tendon deficits, and that Plaintiff was ambulating "quite well."

(Tr. 226.)  Dr. Weis released Plaintiff for unlimited activity. Id.  On September 13, 2010,

Plaintiff continued to report pain in her coccyx, with no relief in her symptoms.  (Tr. 227.)

Plaintiff presented to Bernard C. Randolph, Jr., M.D. on September 14, 2010, for an

evaluation of her tailbone pain.  (Tr. 229-30.)  Plaintiff reported experiencing fairly severe

tailbone pain since June, which she attributed to riding an exercise bike for an extended period of

time.  (Tr. 229.)  Plaintiff also reported a "tailbone problem" as a child, which gradually

resolved. Id.  Plaintiff indicated that her pain is associated with prolonged standing or walking.

Id.  Upon examination, Plaintiff was in no acute distress, her mood and affect were normal, she

was able to ambulate with normal gait pattern, and she was observed to have significant discomfort

when she was sitting. Id.  Examination of the lumbar spine revealed significant tenderness to

palpation in the sacral area and coccyx; mild tenderness over the buttock or gluteal muscle groups

and soft tissues; somewhat limited lumbar motion on extension and flexion; negative straight leg

raising bilaterally; intact and symmetric reflexes; and full leg strength.  (Tr. 230.)  Dr. Randolph

diagnosed Plaintiff with coccydynia and mild low back pain. Id.  He stated that symptoms in the

tail bone area do not appear to be referred from the lumbar spine, and that there is no clear cause

for her coccygeal symptoms. Id.  He stated that Plaintiff's condition is, therefore, "best

characterized as idiopathic." Id.  Dr. Randolph recommended conservative management, and

_____

[8] Medrol is a steroid indicated for the treatment of arthritis. See WebMD,
http://www.webmd.com/drugs (last visited September 4, 2014).

prescribed Lidoderm[9] patches and Relefen.[10]  Id.  He encouraged Plaintiff to "walk and to stay active in order to prevent deconditioning."  Id.

Plaintiff saw Dr. Randolph for follow-up on October 15, 2010, at which time she reported that the Lidoderm patches did not decrease the symptoms at her coccyx, but the symptoms in her low back and upper gluteal areas were decreased with use of the patches.  (Tr. 247.)  Upon examination, Plaintiff walked normal and was in no acute distress; Plaintiff had some pain on palpation over the tip of the coccyx; lumbar motion was full; straight leg raising was negative; no spasms were noted in the lumbar area; minimal tenderness was noted in the buttock bilaterally; strength in the lower extremities was normal; and reflexes were symmetric.  Id.  Dr. Randolph's impression was persistent coccygeal pain.  Id.  He recommended that she continue the Lidoderm patches, and referred her to Dr. Suthar for a consultation and possible injections.  Id.

Plaintiff presented to Manish Suthar, M.D., on October 27, 2010, at which time she complained of aching pain across her lower back going down both her hips, stabbing pain in her left buttocks, and burning in the bottom of both feet.  (Tr. 252.)  Plaintiff also reported numbness and tingling in her arms and hands; numbness in her legs and feet; problems with bladder control; trouble with bowels; and a history of depression and anxiety.  Id.  Upon examination, Plaintiff was not in severe immediate pain or distress, but she was clearly more comfortable standing rather than sitting; she had a somewhat anxious personality; mild tenderness was noted over the posterior superior iliac spine; tenderness was noted directly over the sacral region and extending distally

---

[9]  Lidoderm is indicated for relief of pain associated with post-herpetic neuralgia, with its active ingredient being lidocaine.  See PDR at 1114-1115.

[10]  Relefen is a non-steroidal, anti-inflammatory drug indicated for the treatment of pain, swelling, and joint stiffness from arthritis.  See WebMD, http://www.webmd.com/drugs (last visited September 4, 2014).

into the coccygeal region; neurologic examination was normal; sensory examination was normal; and internal and external rotation reproduced some pain in the buttock region.   (Tr. 253.)   Dr. Suthar's impression was:   symptoms most compatible with coccydynia; degenerative disc disease at L4-5 and L5-S1; and anxiety and depression disorder.   Id.   Dr. Suthar prescribed Vicodin, and recommended a single coccygeal injection "to extinguish the inflammation and stabilize the pain." (Tr. 254.)

Robert Cottone, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on December 20, 2010, in which he expressed the opinion that Plaintiff had no medically determinable impairment.   (Tr. 234.)

Plaintiff saw Dr. Suthar on January 10, 2011, at which time she reported that she struggled with severe anxiety and depression.   (Tr. 248.)   Plaintiff reported that it was her anxiety that prohibits her from seeking out additional treatment and wanting to take medications.   Id. Plaintiff believed her anxiety is an effect from a very strong breathing side effect from sulfa drugs. Id.   Plaintiff reported pain in her wrist, hands, ankles and knees that started developing six weeks prior.   Id.   Dr. Suthar's impression was:   symptoms most compatible with coccydynia; degenerative disc disease at L4-5 and L5-S1; severe anxiety and depression disorder; and generalized arthritic multijoint attack now six weeks in duration.   Id.   Dr. Suthar recommended that Plaintiff see Dr. Sherri Bassi for her anxiety and depression; prescribed Medrol Dosepak for her symptoms of arthritis; and continued the Vicodin.   Id.   He indicated that, if Plaintiff can get resolution of her anxiety, a diagnostic as well as therapeutic single coccygeal injection would be the next recommendation.   Dr. Suthar noted that Plaintiff's anxiety was severe enough that it prohibited Plaintiff from seeking and continuing medical care and treatment.   Id.

Plaintiff saw Sherri Bassi, Ph.D., on February 7, 2011.   (Tr. 298-99.)   Upon examination,

Plaintiff was cooperative, her affect was labile, her mood was depressed, and her speech was normal.   Id.   Dr. Bassi diagnosed Plaintiff with major depression and generalized anxiety disorder, with a GAF score[11] of 50.[12]   (Tr. 299.)   Plaintiff continued to see Dr. Bassi in the year 2011 for psychotherapy on April 5; May 3, 15, and 17; June 21; July 12 and 26; September 16; October 7 and 25; and November 8.   (Tr. 290-98.)

Plaintiff saw Dr. Suthar for follow-up on March 9, 2011, at which time Plaintiff reported some improvement.   (Tr. 249.)   Dr. Suthar recommended a diagnostic block if Plaintiff's anxiety got under control.   Id.

Plaintiff saw Dr. Datta[13] at Psych Care Consultants four times between April and November, 2011.   (Tr. 305-08.)   Dr. Datta diagnosed Plaintiff with generalized anxiety disorder, depressive disorder NOS, panic attacks, and rule out PTSD.   Id.   He prescribed Ativan and Cymbalta.   Id.   On October 19, 2011, Plaintiff reported that the Ativan was helping.   (Tr. 307.) On October 27, 2011, Plaintiff reported that she had not tried the Cymbalta yet, because she feared she would die if she took the medication.   (Tr. 306.)

Plaintiff presented to SLU Care Division of Rheumatology on June 7, 2011, with complaints of joint pain, muscle pan, fatigue, insomnia, and depression.   (Tr. 276.)   Plaintiff was diagnosed with fibromyalgia and coccydynia.   Id.

---

[11] The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."   Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[12] A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."   DSM-IV at 32.

[13] The record does not specify Dr. Datta's first name or his credentials.   At the hearing, Plaintiff's counsel referred to this provider as Plaintiff's "treating psychiatrist," and counsel's March 26, 2012 letter indicated that the doctor was male.   (Tr. 29-30; 178).

Plaintiff saw Dr. Suthar for follow-up on June 16, 2011, at which time she still struggled with the thought of undergoing any injections. (Tr. 250.) Dr. Suthar suggested medications to treat Plaintiff's fibromyalgia, but Plaintiff reported that she knew she would not take the medications. Id. Dr. Suthar stated that it was difficult to help Plaintiff when she cannot follow through with the recommendations he provided. Id. Dr. Suthar continued the Vicodin and recommended a trial of a TENS[14] unit. Id.

Dr. Bassi completed a Mental Residual Functional Capacity Questionnaire on October 20, 2011. (Tr. 300-04.) Dr. Bassi listed Plaintiff's diagnoses as: major depression, and generalized anxiety, with a current GAF and highest GAF in the past year of 55.[15] (Tr. 300.) Dr. Bassi stated that Plaintiff had a "fair" response to ten sessions of psychotherapy. Id. Dr. Bassi described her clinical findings as follows: oriented times three, emotionally labile, and no psychotic symptoms. Id. The following signs and symptoms were noted: decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbance of mood or affect, persistent irrational fear of a specific object or situation which results in a compelling desire to avoid the dreaded object or situation, easy distractibility, and autonomic hyperactivity. (Tr. 301.) Dr. Bassi expressed the opinion that Plaintiff was unable to meet competitive standards in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms, ability to perform at a consistent pace without an unreasonable number and length of rest periods, and her

[14] Transcutaneous electrical nerve stimulation ("TENS") is a method of reducing pain by passage of an electric current. Stedman's at 1838.

[15] A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

ability to deal with normal work stress.   (Tr. 302.)   Dr. Bassi found that Plaintiff was seriously

limited, but not precluded in her ability to maintain attention for two hour segments, maintain

regular attendance and be punctual within customary tolerances, and accept instructions and

respond appropriately to criticism from supervisors.   Id.   Dr. Bassi indicated that Plaintiff was

limited, but satisfactory in her ability to get along with co-workers or peers without unduly

distracting them or exhibiting behavioral extremes.   Id.   In support of these findings, Dr. Bassi

stated that Plaintiff has very low energy and frequent exacerbation of anxiety, which interferes

with her daily functioning.   Id.   Dr. Bassi found that the following abilities were limited but

satisfactory:   understand and remember detailed instructions, carry out detailed instructions, set

realistic goals or make plans independently of others, deal with stress of semiskilled and skilled

work, and interact appropriately with the general public.   (Tr. 303.)   Dr. Bassi anticipated that

Plaintiff would be absent from work due to her impairments more than four times a month.   (Tr.

304.)

        Plaintiff saw a physician assistant at Dr. Suthar's office on November 7, 2011, at which

time plaintiff reported that she was still working up the courage to take Cymbalta, and also to

consider a coccyx injection.   (Tr. 311-312.)   Plaintiff was prescribed Norco.   (Tr. 312.)

Plaintiff returned for follow-up on January 3, 2012, at which time she reported that the medication

was not working well and not lasting as long as it used to.   (Tr. 309.)   It was noted that Plaintiff

was working with Dr. Bassi to overcome her fear of injections and medication.   Id.   She took

Cymbalta for the first time the previous day, and felt very good about that accomplishment.   Id.

### The ALJ's Determination

        The ALJ made the following findings:

        1.        The claimant meets the insured status requirements of the Social Security Act

through December 31, 2014.

2.　　The claimant has not engaged in substantial gainful activity since June 30, 2010, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.　　The claimant has the following severe impairments: major depressive disorder, generalized anxiety disorder, coccydynia, and degenerative disc disease (20 CFR 404.1520(c)).

4.　　The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.　　After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant has the ability to occasionally lift and/or carry up to 20 pounds, and frequently lift and/or carry up to 10 pounds. The claimant also has the ability to stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. However, the claimant is unable to operate foot control operations. The claimant further has the ability to occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl, but should never climb ladders, ropes, or scaffolds. The claimant should also avoid concentrated exposure to extreme vibrations and all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery. From a mental standpoint, the claimant is limited to only occupations that involve simple, routine, and repetitive tasks. The claimant is further limited to low stress jobs, defined as requiring only occasional decision making and only occasional changes in the work setting with only occasional interaction with the public.

6.　　The claimant is unable to perform any past relevant work (20 CFR 404.1565(20 CFR 404.1565).

7.　　The claimant was born on June 29, 1968, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.　　The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.　　Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 13-19.)

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on September 12, 2010, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

(Tr. 20.)

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.      Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in

Appendix One to 20 C.F.R. 404.   20 C.F.R. pt. 404, subpt. P, App. 1.   If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.   <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).   If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.   <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).   If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.   <u>See id.</u>   If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.   <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).   The claimant is entitled to disability benefits only if s/he is not able to perform any other work.   <u>See id.</u>   Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.   <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.   The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.   <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).   If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent."   20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).   The Commissioner must then rate the degree of

functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    <u>Plaintiff's Claims</u>

Plaintiff argues that the ALJ erred in determining Plaintiff's RFC. Plaintiff also contends that the hypothetical question posed to the vocational expert was erroneous. The undersigned will discuss Plaintiff's claims in turn.

### 1.    **Residual Functional Capacity**

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). The claimant has the ability to occasionally lift and/or carry up to 20 pounds, and frequently lift and/or carry up to 10 pounds. The claimant also has the ability to stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. However, the

claimant is unable to operate foot control operations. The claimant further has the ability to occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl, but should never climb ladders, ropes, or scaffolds. The claimant should also avoid concentrated exposure to extreme vibrations and all operational control of moving machinery, working at unprotected heights, and the use of hazardous machinery. From a mental standpoint, the claimant is limited to only occupations that involve simple, routine, and repetitive tasks. The claimant is further limited to low stress jobs, defined as requiring only occasional decision making and only occasional changes in the work setting with only occasional interaction with the public.

(Tr. 15.)

Plaintiff argues that the ALJ failed to point to "some" medical evidence to support his RFC findings, and therefore fails to comply with the standards contained in Singh and Lauer.

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In determining Plaintiff's RFC, the ALJ first properly evaluated the credibility of Plaintiff's subjective complaints of pain and limitation. An ALJ may discredit a claimant's

subjective allegations of disabling symptoms to the extent they are inconsistent with the overall record as a whole, including: the objective medical evidence and medical opinion evidence; the claimant's daily activities; the duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medications and medical treatment; and the claimant's self-imposed restrictions.    Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ cited the following factors in discrediting plaintiff's subjective complaints of disabling pain and limitations:   (1) the lack of objective medical evidence supporting Plaintiff's complaints; (2) Plaintiff achieved good relief from her pain with medication; (3) Plaintiff received only conservative treatment; (4) Plaintiff was non-compliant with treatment recommendations; and (5) Plaintiff engaged in significant daily activities.   (Tr. 16-17.)

Plaintiff contends that the ALJ's determination regarding Plaintiff's physical limitations is not supported by substantial evidence, because the ALJ failed to cite any medical evidence for his findings.   Contrary to Plaintiff's contention, however, the ALJ cited specific medical evidence upon which he relied.

The ALJ first stated that Dr. Weis examined Plaintiff in July 2010 and found that Plaintiff's coccydynia symptoms were no more than mild.   (Tr. 16, 225.)   Dr. Weis found that Plaintiff had no neurological or tendon deficits, and was able to ambulate well.   Dr. Weis also noted that Plaintiff was obtaining "fairly good relief" from medication.   Dr. Weis released Plaintiff for "unlimited activity."   The ALJ next noted that Dr. Randolph examined Plaintiff in September 2010, and concluded that Plaintiff should continue conservative treatment and stay active.   (Tr. 16, 230.)   Upon examination, Dr. Randolph noted only mild lumbar symptoms, no spasms, full range of motion, negative straight leg raising test, and normal strength in the lower extremities.

20

The ALJ pointed out that MRIs of Plaintiff's lumbar spine revealed no evidence of nerve root compression, spinal arachoniditis, or spinal stenosis. (Tr. 17, 216.) Finally, the ALJ noted that Dr. Suthar recommended conservative treatment, consisting of medication and injections, and Plaintiff did not follow through with his treatment recommendations. (Tr. 17.)

The ALJ's physical RFC is supported by substantial evidence on the record as a whole. The ALJ found that the objective medical evidence does not support Plaintiff's allegations of severe coccydynia. The ALJ relied on the findings of Drs. Weis, Randolph, and Suthar in determining Plaintiff's RFC. Minimal findings were noted by these providers on examination. Notably, none of the physicians imposed any limitations on Plaintiff. In fact, Dr. Weis released Plaintiff for unlimited activity in August 2010. (Tr. 226.) In addition, the ALJ performed a proper credibility analysis and found Plaintiff's allegations less than credible. (Tr. 16-17) Thus, the ALJ's finding that Plaintiff is capable of performing a limited range of light work is supported by substantial evidence.

With regard to Plaintiff's mental RFC, Plaintiff contends that the ALJ erred in evaluating the opinion of Plaintiff's treating psychologist, Dr. Bassi.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. "A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). However, "[w]hen a treating physician's opinions are inconsistent or

contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh, 222 F.3d at 452. The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1). Under the regulations, the ALJ "will always give good reasons . . . for the weight [he or she] give[s] [a claimant's] treating source opinion." 20 C.F.R. § 404.1527(c)(2).

Dr. Bassi completed a Mental Residual Functional Capacity Questionnaire on October 20, 2011, in which she listed Plaintiff's diagnoses as: major depression, and generalized anxiety, with a current GAF score and highest GAF score in the past year of 55. (Tr. 300.) Dr. Bassi expressed the opinion that Plaintiff was unable to meet competitive standards in her ability to complete a normal work day and work week without interruptions from psychologically based symptoms, ability to perform at a consistent pace without an unreasonable number and length of rest periods, and her ability to deal with normal work stress. (Tr. 302.) Dr. Bassi found that Plaintiff was seriously limited but not precluded in her ability to maintain attention for two hour segments, maintain regular attendance and be punctual within customary tolerances, and accept instructions and respond appropriately to criticism from supervisors. Dr. Bassi indicated that Plaintiff was limited but satisfactory in her ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. Dr. Bassi found that the following abilities were limited, but satisfactory: understand and remember detailed instructions, carry out detailed instructions, set realistic goals or make plans independently of others, deal with stress of semiskilled and skilled work, and interact appropriately with the general public. (Tr. 303.) Dr. Bassi anticipated that Plaintiff would be absent from work due to her impairments more than four

times a month.   (Tr. 304.)

The ALJ indicated that he was assigning "only some weight" to Dr. Bassi's opinion.   (Tr. 17.)   Specifically, the ALJ stated that he was giving significant weight to Dr. Bassi's opinion that Plaintiff's symptoms cause no limitations, but little evidentiary weight to Dr. Bassi's remaining opinion.   The ALJ stated that Dr. Bassi primarily relied upon Plaintiff's subjective complaints and assessed GAF scores of 50 and 55, which indicate "predominantly moderate symptoms."   The ALJ further noted that Plaintiff's medical records reveal that medication helped Plaintiff's symptoms, and her activities show that she is "quite active."   (Tr. 18.)   The ALJ stated that this evidence shows that Plaintiff's symptoms are not as severe as Plaintiff alleges and that Dr. Bassi relied heavily upon Plaintiff's subjective complaints rather than objective evidence.   The ALJ also noted that state agency psychologist Dr. Cottone found that Plaintiff did not have a medically determinable impairment based on a review of Plaintiff's medical records conducted in December of 2010.   (Tr. 234.)

The undersigned finds that the ALJ provided sufficient reasons for discrediting portions of Dr. Bassi's opinion.   Significantly, Dr. Bassi found that Plaintiff was able to satisfactorily perform twenty-two of twenty-five work functions, including all aptitudes needed to perform semiskilled and skilled work.   (Tr. 302-03.)   Although Dr. Bassi found that Plaintiff was unable to meet competitive standards in her ability to deal with normal work stress associated with unskilled work, Dr. Bassi also found that Plaintiff was capable of dealing with the stress associated with semi-skilled and skilled work.   The ALJ's statement that Dr. Bassi "primarily found that the claimant's symptoms cause no limitations," is therefore accurate.   (Tr. 17.)

The ALJ noted that the disabling limitations found by Dr. Bassi were inconsistent with Dr. Bassi's own treatment notes.   Dr. Bassi assessed a GAF score of 50 at Plaintiff's initial evaluation

in February 2011, and assessed a GAF score of 55 in her October 2011 opinion. (Tr. 300.)

Plaintiff disputes the ALJ's statement that Plaintiff's GAF scores are indicative of "predominantly moderate symptoms." (Tr. 17.) A score of 50 is on the borderline between serious to moderate symptoms, whereas a score of 55 falls in the middle of the moderate symptom range.[16] The ALJ's characterization of Plaintiff's GAF scores as indicative of predominantly moderate symptoms is therefore accurate.

Dr. Bassi's treatment notes also do not reflect the presence of serious symptoms. Dr. Bassi consistently noted that Plaintiff's "reported mood" was anxious and depressed. (Tr. 290-97.) Dr. Bassi described Plaintiff's affect as either "normal" (Tr. 297, 294), "labile" (Tr. 296, 295, 293, 291, 290) or "irritable" (Tr. 292.) Plaintiff's thought process was intact and she denied any suicidal ideation. (Tr. 290-97.) Dr. Bassi noted Plaintiff's anxiety related to taking medication on several occasions, but noted few other findings on examination. Dr. Bassi's treatment notes do not support the presence of disabling limitations.

The ALJ pointed out that Plaintiff's reported activities show that she is "quite active." (Tr. 18.) Plaintiff reported in a function report dated October 1, 2010 that she takes care of five children, cooks meals, does household chores, goes outside daily, drives, shops, manages her own finances, reads daily, crotchets, talks to others daily, and attends Church every Sunday. (Tr. 145-50.) Plaintiff further stated that she has "no attention problems." (Tr. 150.) Plaintiff's reported daily activities are inconsistent with the presence of disabling mental impairments.

Finally, the ALJ discussed the other medical evidence of record. The ALJ pointed out that Dr. Datta's records reveal that Plaintiff's condition improved with medication. (Tr. 9, 306-07.)

_____

[16] See DSM-IV at 32.

In addition, the ALJ noted that state agency psychologist Dr. Cottone expressed the opinion that Plaintiff had no medically determinable impairment based on a review of the record.   (Tr. 234.) The ALJ properly assigned "little weight," to this opinion, finding that Plaintiff does have a severe medically determinable mental impairment.   (Tr. 18.)   It is significant, however, that Plaintiff was not seeing a mental health provider when Dr. Cottone reviewed the record in December 2010, despite her allegation of a disabling mental impairment beginning on June 30, 2010.   Plaintiff was referred to Dr. Bassi by Dr. Suthar in January 2011 due to her anxiety about taking medication. (Tr. 248.)

In sum, the mental RFC formulated by the ALJ is supported by substantial evidence on the record as a whole.   The ALJ properly concluded that Dr. Bassi's opinion that Plaintiff had limitations that would preclude the performance of unskilled work was not supported by the record.   The ALJ nonetheless accorded some weight to Dr. Bassi's opinion in limiting Plaintiff to low stress jobs involving only occasional interaction with the public.   The ALJ's determination is consistent with the objective medical evidence, including Dr. Bassi's treatment notes and the treatment notes of Dr. Datta, as well as Plaintiff's reported daily activities.

2.     **Vocational Expert**

Plaintiff also argues that the hypothetical question posed to the vocational expert did not capture the concrete consequences of Plaintiff's impairments, because it was based on the ALJ's erroneous RFC findings.

 "A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments."   Hulsey v. Astrue, 622 F.3d 917, 922 (8th Cir. 2010).

The undersigned has found that the ALJ's RFC determination is supported by substantial

evidence on the record as a whole.   The hypothetical question posed to the vocational expert is consistent with the ALJ's RFC determination.   The ALJ concluded, based on this RFC, that Plaintiff was capable of performing other jobs, such as cafeteria attendant, file clerk, or small products assembler.   (Tr. 19, 48-49.)    Thus, Plaintiff's claim that the hypothetical question was flawed lacks merit.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding Plaintiff not disabled, because the evidence of record does not support the presence of a disabling impairment.   Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

_____

ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of September, 2014.